CHARLES C. LEE v. THE MICHIGAN CENTRAL RAILROAD COMPANY.

*Master and servant—Incompetent fellow-servant—Question for jury.*

1. A master is liable for injuries to servants that spring from such negligent acts of fellow-servants as are due to their incompetency; citing *Hilts v. Railway*, 55 Mich. 437; and where in a negligence case there is evidence tending to show such incompetency, the question should be submitted to the jury.

2. The following general propositions are summarized from the opinion of Mr. Justice McGRATH:

*a*—Employers may be negligent in the *selection* of servants as well as in their *retention;* citing *Hilts v. Railway*, 55 Mich. 437; *Mining Co. v. Kitts*, 42 Id. 34; *Smith v. Potter*, 46 Id. 258.

*b*—In the absence of any evidence as to the exercise of care in his selection, proof that a servant who has been in the service but two or three weeks was incompetent when employed need not be supplemented by proof of the master's knowledge of his incompetency.

*c*—Where a servant competent at the time of his employ-

ment becomes incompetent, or indulges in a habit which renders him incompetent during its indulgence, notice of such incompetency or habit must be brought home to the master, or it must be so notorious as to charge the master with knowledge; but when the incompetency existed at the time of the employment, proof of notice to the master is unnecessary.

Error to Wayne. (Gartner, J.) Argued July 2, 1891. Decided October 9, 1891.

Negligence case. Plaintiff brings error. Reversed. The facts are stated in the opinion.

*Conely, Maybury & Lucking,* for appellant.

*Henry Russel* (*Henry M. Campbell* and *Ashley Pond,* of counsel), for defendant.

McGRATH, J. Plaintiff had been employed as a brakeman for about one year. He had been at work in the yard as helper for only a month. He had had no other experience in switching. He did not know Seward, the yard-master, before the accident, except that he had seen him at work in the office. He knew nothing about Seward's experience or knowledge; said that he was incapable of giving any opinion as to that. Seward had been acting as yard-master two or three weeks before the accident.

Plaintiff was injured while assisting in making up a freight-train, at about 7:30 A. M. This train was sometimes made up by the night men, and when plaintiff came on he supposed it was made up, except the cars which he was coupling to it. He had no notice from any source that a crew was at work at the west end, or that the main part of the train would be moved. He did not know that the west part of the train was coming, and had no reason to expect that it would be moved. He was not present when the order was given by Seward

to Barry to couple on these cars. The track was a curved track, and there were 38 cars in the train. The adjoining tracks were full of cars. Up to the time of the injury, plaintiff had never worked at one end of a train while work was being done at the other end. Employés were usually notified by the yard-master when another train or engine was. expected on the same track.

Several witnesses were examined in plaintiff's behalf.

Staats had been at work for the company 11 years up to 1890. Began as foreman of a chain-gang, then worked as car inspector, then as brakeman, then as helper in the yard for two or three years, then as yard conductor, or switchman, and was extra yard-master when a vacancy occurred.

Finch is yard-master for the Grand Trunk road. Had been in the employ of defendant for 16 years immediately before 1889. Was first switchman's helper, then had charge of an engine, then switchman for several years before he became yard-master.

Wells has been railroading since 1869. Worked since 1881 for defendant. Was night yard-master in 1888, 1889, and part of 1890. Commenced as helper, was then switchman for four or five years, then became night yard-master.

McAllister was conductor of this freight-train, and had been in the employ of defendant since 1881. Was at the time of the injury engaged in checking off the cars.

Dyer had been in the employ of defendant from the fall of 1876 till March, 1890, as car-checker in the lower yard.

These witnesses all testify that they had known Seward for years before he was appointed yard-master; that Seward had been messenger, car-checker or number-taker, and train-master's clerk, and that his work had been office work only; that he had had no experience as helper, switchman, or assistant yard-master.

Staats, Wells, and Finch testify that experience in a yard as switchman is essential to the proper performance of the duties as yard-master; that Seward was incompetent; that they based their statements as to his incompetency upon their knowledge of his inexperience, and their observation as to the way he set about doing his work; that an inexperienced man could not go to work and make up trains without great danger; that it was customary for the yard-master to notify the crews of the fact whenever men were to work at the other end of the train, or to signal them; that the movement of the body of the train would not be expected or looked for unless they were informed that such a movement was to be made; that, when there was a gap in a train, the closing of this gap would not be expected without notice; that there was a gap in this train; that plaintiff, from where he stood, could not see the engine or the front section of the train, because of the curved track, and the presence of cars on adjoining tracks.

Defendant offered no testimony as to the diligence exercised by the company in the selection of the yard-master or as to his competency for the position.

Seward was personally directing the movements of the engine at the west end of the train. It was shown that, when he ordered Barry to put the cars on at the east end, he did not notify him of his intention to move the train from the west end. He gave no warning or signal to any one.

Barry testified that he was ordered by Seward to take the two cars, and put them on the east end, but that Seward did not notify him that he (Seward) intended to operate at the west end, or move the body of the train. On cross-examination, Barry said that he had been up at the west end that morning; that he knew there was an

engine there; that, as he moved towards the east end of the train, he could not see the engine at the west end, but he saw the whole train move from the west end, and he stopped his engine, and waited one or two minutes, until the body of the train had stopped, and then signaled his engineer to back, and he did so. This witness was the only one who claimed that there was any movement of that portion of the train to which plaintiff was coupling until just as he was in the act. Even if the testimony of this witness stood alone, it does not follow that either the witness or plaintiff was negligent. Witness waited until the train came to a full stop. Seward had ordered Barry to put on these cars at that point. Seward was directing the movement of the locomotive at the west end. Barry had a right to suppose, and act upon the supposition, that, knowing that they were at work there, Seward would not order the train to be backed down upon them while they were executing his orders. In the absence of any notice to them that the west end of the train would be moved, or of any signal or warning, Barry and plaintiff would naturally expect that Seward would refrain from doing that which would endanger their lives while in the execution of Seward's orders. Their orders were to put on the cars, and, even conceding that the body of the train had moved, they did nothing until the train had stopped; and why was not this as opportune and proper a time to carry out the orders given them as any subsequent time would have been? If a signal had been agreed upon, and, without waiting for it, they had proceeded, the case would have been different.

Something has been said about the discrepancy in the testimony of the witnesses as to the signals which should have been given. I presume that the nature of the sig-

nal which should be given would depend very much upon conditions or surroundings.

Under the facts disclosed here, it was clearly error to take the case from the jury. It is unnecessary to determine here whether or not Seward was a fellow-servant. A master is liable for injuries to servants that spring from such negligent acts of fellow-servants as are due to their incompetency. *Hilts v. Railway,* 55 Mich. 437. There was evidence tending to show that Seward was incompetent, and that question was for the jury. Employers may be negligent in the selection of servants as well as in their retention. *Hilts v. Railway, supra.; Quincy Mining Co. v. Kitts,* 42 Mich. 34; *Smith v. Potter,* 46 Id. 258. In the absence of any evidence as to the exercise of care in his selection, proof that a servant who has been in that service but two or three weeks was incompetent when employed need not be supplemented by proof of the company's knowledge of his incompetency. The presumption that defendant had done its duty is overcome by proof that the servant was incompetent when employed. Where one competent at the time of his employment becomes incompetent, or indulges in a habit which renders him incompetent during its indulgence, notice of the incompetency or of the habit must be brought home to the company, or the incompetency or habit must be so notorious as to charge the company with knowledge; but when the incompetency does not arise after the employment, but existed at the time, proof of notice to the company is not necessary.

There was no testimony tending to show that plaintiff had knowledge of Seward's incompetency. He was not qualified to pass upon that question, as he himself expressed it.

The judgment is reversed, and a new trial ordered, with costs.

MORSE and LONG, JJ., concurred with McGRATH, J.

GRANT, J. (*dissenting*). Plaintiff was in the employ of the defendant as a helper, or assistant switchman, in its yard at Jackson, Michigan. He received an injury in the hand while engaged in coupling some freight-cars, and brought this suit to recover damages, alleging negligence on the part of the defendant. The negligence claimed is the incompetency of the yard-master, Seward.

In order to maintain the action, it was incumbent upon the plaintiff to prove four facts:

1. The yard-master's incompetency.
2. The defendant's knowledge of it, or that by the exercise of due care it should have known it.
3. Plaintiff's ignorance of it.
4. That his incompetency was the direct cause of the injury.

At the close of plaintiff's case, the court directed a verdict for the defendant.

This yard is what is termed a "double-end yard." The switches converge to a point at either end, so that cars can be pushed in and out from both ends. It was common to work at both ends at the same time when necessary. This was known to the plaintiff, for on direct examination he testified as follows: "With reference to working both ends of the train at the same time, I had never known it to be done before without notifying each crew at each end;" though on cross-examination he testified: "I never worked that way before. I never knew them to work from both ends before this morning." Plaintiff was experienced in railroading, and had been engaged in the yard about a month. The tracks run east and west. The train consisted of 38 cars, and was being made up from both ends. Plaintiff's crew consisted of the switchman, called a "yard conductor," who had charge of the crew, his helper, the plaintiff, engineer,

and fireman. Plaintiff's crew had been directed by the yard-master to get some freight-cars, and attach them to the east end of the train. Barry, the switchman of plaintiff's crew, had obtained the cars, and brought them towards the east end of the train. It was the duty of the plaintiff to step between the cars, and arrange the coupling. He signaled to Barry to back up the cars. As they backed up and reached the coupling, there was a movement backward of the cars upon the west end of the train, and the plaintiff's hand was caught and injured. The yard-master was engaged with the other crew at the west end, and had himself assisted in coupling the cars.

Plaintiff insists that he was entitled to notice from the yard-master that the cars upon the west end were about to move; that this was negligence; and that it resulted from the yard-master's incompetency. Plaintiff's witnesses do not agree as to the manner in which such notice should be given. Mr. Finch, who preceded Seward as yard-master, testified that he sent a man to the other end of the yard to tell them to be careful, that they were working at the other end of the train. Another witness testified that the yard-master generally stands at the head of the train when they put these cars on, and sees that they do not push them in too close together, to protect the train and train-men. A third witness testifies that he should have stood somewhere near the center of the train, so that he could stop the cars in case they were coming together.

Two crews, of four men each, were at work upon this train. It is evident that the yard-master cannot give personal notice to each employé. He acts through the yard conductors, or switchmen. When these have notice, or knowledge which is equivalent to notice, of how the work is being done, it is then the duty of these con-

ductors to convey the necessary information to the members of their crews. If they fail to look out for themselves, or the men under their orders, the fault is not chargeable to the yard-master. Previous to the accident Barry had been at the west end of the train, evidently received his orders there from the yard-master, and knew that work was going on at that end in the usual way. He therefore had all the notice that was necessary. When plaintiff gave the signal to Barry to back up, the west end of the train was also backing up to close a gap two or three cars west of where plaintiff stood to make the coupling. Barry waited until he supposed the gap was closed and the cars had stopped. He then communicated plaintiff's signal to his engineer to back up, which the engineer did. Either the west-end cars had not fully stopped, or else, for some unexplained reason, they immediately "jammed back again," as the plaintiff expressed it, causing the accident.

The only business in which both these crews were engaged was the making up of this train. It was the custom to make it up from both ends. This work consisted entirely in taking cars from other tracks, and placing them on one track form both ends of the yard. Of necessity, therefore, the cars must move towards each other. This must have been known to the employés in the yard, who had been there long enough to become acquainted with the business. No fault is found with this method. Plaintiff's witness Finch, the yard-master immediately preceding Seward, testifies that such was the usual method. He says:

"Often had two engines at work at the same time, but I was always very careful about it. I always sent a man to the other end of the yard to tell them to be careful, to look out, that they were working on the other end of the train. I have sent Mr. Lee there several times myself, when he was working for me."

As already stated, the sole act of incompetency or of negligence complained of is the failure of Seward to notify plaintiff's crew that the train was to be made up from both ends. But it cannot be denied that Barry, the switchman of plaintiff's crew, knew this, and it must follow that any further notice or caution is unnecessary. The learned circuit judge was therefore correct in instructing the jury that there was no evidence showing the negligence of Seward.

The court made no ruling upon the question of the incompetency of the yard-master, but, if it had been important to instruct the jury upon this point, he should have instructed them that the evidence failed to make any case. The uncontradicted evidence is that Seward had been in the employ of the company for about 18 years in and about this yard. He was first messenger boy, then successively office boy, number-taker, car distributor, clerk in train-master's office, chief clerk for train-master, from which last position he was appointed as yard-master. During this time much of his work was in the yard, and it is beyond controversy that he was familiar with the manner of the work, the location of the tracks, and the movement and the handling of the cars. It is too manifest for argument that the simple work of making up these trains is not difficult nor complicated, and that in knowledge and experience Mr. Seward was competent to do it. There is no evidence tending to show that this experience of Mr. Seward was not sufficient to qualify him for the position of yard-master. There was, therefore, no evidence upon which to base a charge that the defendant had employed a yard-master whom it knew, or should have known, to be incompetent. Neither is there any claim on the part of the plaintiff that he had become incompetent after his appointment. No act of incompetency is shown. The

plaintiff's case in this regard rests solely upon the testimony of four witnesses that Seward had the reputation, among the yard men, of being incompetent. They base this reputation entirely upon the fact that he had had no experience as a switchman. Plaintiff, though he had been employed there daily for a month, had never heard of this reputation. The further significant fact is that none of these witnesses made any complaint or protest against the employment of Mr. Seward. Is it the law that one who has had no experience as a switchman is incompetent to fill the position of yard-master? I can find no authority or reason for such a rule.

Judgment should be affirmed, with costs.

CHAMPLIN, C. J., concurred with GRANT, J.