[S. F. No. 4605.  In Bank.—December 4, 1908.]

PURA JANE STILL et al., Respondents, v. SAN FRAN-
CISCO AND NORTHWESTERN RAILWAY COM-
PANY (a Corporation), Appellant.

MASTER AND SERVANT—RAILROAD—FELLOW-SERVANTS—CONDUCTOR AND
FIREMAN ON DIFFERENT TRAINS.—Under the law of this state, as it
existed in the year 1903, a conductor on a regular freight train was
a fellow-servant of a fireman on another train, being operated by
the same railroad.

ID.—LIABILITY FOR EMPLOYING INCOMPETENT SERVANT.—Under section
1970 of the Civil Code, as it stood at that time, an employer was
liable to an employee for damages resulting from his failure to use
ordinary care in the selection of other employees, and to select only
those who are competent to properly perform the duties of the posi-
tion for which they are selected.

ID.—BURDEN OF PROOF TO SHOW INCOMPETENCY OF FELLOW-SERVANT.—
In an action by an employee, based upon the employer's failure to
exercise such ordinary care, it is incumbent on the plaintiff to show
that the fellow-servant causing the injury was in fact incompetent
for the position to which he was assigned, that the employer at the
time of his selection therefor either knew or by the exercise of
ordinary care would have known of such incompetency, and that
such incompetency was the cause of the accident.

ID.—VERDICT FOR PLAINTIFF—FINDING OF INCOMPETENCY.—In such an
action, the verdict of the jury in favor of the plaintiff is the equiv-
alent of a finding in the affirmative upon all such propositions, and
where there is substantial evidence in support thereof the verdict
must stand, however strongly such evidence may be opposed to other
evidence given on the trial.

ID.—INCOMPETENCY DEFINED.—Incompetency in an employee connotes
the converse of reliability in all that is essential to make up a rea-
sonably safe person, considering the nature of the work and the
general safety of those who are required to associate with such per-
son in the general employment.

ID.—INCOMPETENCY OF CONDUCTOR—INABILITY TO UNDERSTAND ORDERS
—EVIDENCE.—One who does not know the meaning of the rules or
orders used on a railroad relative to the movement of trains is ab-
solutely incompetent to act as a conductor of a train thereon where
he would be called upon to follow such rules and orders in moving
his train.  In the present case the evidence is held to have war-
ranted the jury in finding that the conductor whose conduct was in
question was without this knowledge, and that his ignorance in this
respect was the sole cause of the accident.

ID.—ORDINARY CARE IN SELECTING SERVANT.—The term "ordinary care," as used in defining the obligation imposed upon an employer in selecting an employee, means that degree of care that a man of ordinary prudence would use in view of the nature of the employment and the consequences of the employment of an incompetent person, a degree of care commensurate with the nature and danger of the business and the grade of service for which the servant is intended, and the hazards to which other servants are to be exposed from the employment of a careless or incompetent person.

ID.—HAZARDOUS OCCUPATION—DUTY TO MAKE INVESTIGATION—REASONABLENESS OF INVESTIGATION.—Where the service in which the servant is employed is such as to endanger the lives and persons of coemployees if the servant is not competent, an employer is bound, in the exercise of ordinary care, to make a reasonable investigation into his character, skill, qualifications, and habits of life. The question whether he has made such investigation as is reasonable under all the circumstances is peculiarly one for the jury. And this is so, even where there is no conflict in the evidence on the question of negligence, if the conceded facts are such that reasonable minds might differ as to the conclusion to be drawn.

ID.—PRESUMPTION AS TO REASONABLE CARE IN EMPLOYING—KNOWLEDGE OF INCOMPETENCY—EVIDENCE—TIME OF EMPLOYMENT.—The presumption is that the employer has done his duty in the selection of the servant, and, as a general rule, the employer's knowledge of incompetency or the fact that he would have obtained such knowledge had he made reasonable inquiry, must be shown by evidence independent of that showing the incompetency, and cannot be inferred therefrom. The incompetency, however, of an employee at the time of his employment may be of such a character that the evidence showing it will be legally sufficient to rebut the presumption that the employer used the requisite care in his selection, and make the question one for the jury. The time of his employment, as used in this connection, means the time when he was assigned to the particular employment.

ID.—AFFIRMATIVE INQUIRIES AS TO QUALIFICATIONS.—An employer is bound to institute affirmative inquiries in order to ascertain the qualifications of an employee whom he transfers to a more responsible position, for which special qualifications are demanded, unless the employee has given proof of his capacity in some similar position.

ID.—INFERENCE RESULTING FROM CONDUCTOR'S INCOMPETENCY—EVIDENCE.—The foregoing rules are peculiarly applicable in the case of incompetency on the part of a conductor of a regular schedule train, consisting of a want of knowledge by him as to the meaning and effect of telegraphic orders referring to the movement of his train in relation to other trains on the road. When such incompetency is shown, it is a fair inference that a reasonable investigation would have disclosed it, when it could have been remedied by

proper instructions. In the present case the evidence is held sufficient to sustain the finding by the jury that the employer had never made a reasonable investigation as to the qualifications of the conductor.

Id.—Personal Examination not Essential—What is Adequate Investigation. — A personal examination of one about to be employed as a conductor of a railroad train is not always essential to the exercise of reasonable care. Such investigation as will warrant the assumption under all the existing circumstances that the employee has adequate knowledge and qualifications is essential. Such an assumption may be warranted by the knowledge of the employer of the experience and reputation of the employee as to work calling for the knowledge and qualifications adequate to the discharge of the duties of the place, or by the recommendations of other persons on whom he is justified in relying. Each case must be determined on its own facts, and generally the question whether due care was exercised by the employer in this regard is one exclusively for the jury and trial judge.

Id.—Instructions Emphasizing Particular Evidence.—In an action to recover for personal injuries to an employee, alleged to have been occasioned by an incompetent co-employee, it is not error to refuse an instruction to the effect that in determining the question of incompetency the jury might take into consideration "with other evidence" given on the trial, certain specified evidence, where no reason appears why the court should have singled out such evidence for special emphasis, and under their general instruction the jury must have known that such evidence with all other evidence on the subject was to be considered by them in determining the question.

Id.—Instructions as to Acts Constituting Reasonable Investigation.—In such a case, an instruction asked by the defendant, in which it was attempted to have the court state what specific acts, inquiries, and information would constitute a reasonable investigation warranting the assumption of competency and requiring a conclusion that the defendant had used proper care and which would have been misleading as applied to the evidence given on the trial, is properly refused.

APPEAL from a judgment of the Superior Court of Humboldt County. G. W. Hunter, Judge.

The facts are stated in the opinion of the court.

Gillett & Cutler, and F. A. Cutler, for Appellant.

George T. Rolley, and Coonan & Kehoe, for Respondents.

ANGELLOTTI, J.—This is an appeal by defendant from a judgment for plaintiffs in an action brought by the surviving

wife and two minor children of Charles Still, deceased, for damages resulting to them from the death of said Still, alleged to have been caused by the negligence of defendant. The principal claim of defendant is that the evidence given on the trial is insufficient to support the verdict.

Charles Still was killed on October 5, 1903, in a collision which occurred between two of defendant's trains, one known as "Extra No. 4," a special train, in Conductor Rolley's charge, which was running southerly from South Bay, near Eureka, and the other known as "Freight Train No. 5," a regular schedule train, under Peter Clark as conductor, which was running northerly from Carlotta, the southerly terminus of the road, to South Bay. He was the fireman on "Extra No. 4," and at the time of the collision was in the cab of the locomotive engaged in the discharge of his duties. His train was proceeding under an order addressed to its conductor and engineer, which was as follows: "Leave South Bay 6:45 October 5th. Take E. R. V. L. Co's empties to their switch. Return light to Gravel Pit. Meet P. L. Co's train at Singley's. Meet No. 5 at Cousins' switch. Exchange engines at Cousins' switch with No. 5." A special meet order had been given to the conductor and engineer of freight train 5, reading as follows: "October 5, '03. Train No. 5, Conductor Clark, Engineer Thayer. Meet Extra 4 at Cousins' switch. Exchange engines with her. Take E. R. V. Lbr. Co's train to S. Bay." It is conceded that such an order supersedes all schedules and means exactly what it says,—viz. that the trains to which it is addressed must meet at the place named, and that the one arriving first at the designated place must stay at that place until the other train arrives, or until the order is withdrawn or changed. Train 5 started from Carlotta at its scheduled time and proceeded according to its schedule to Cousins's switch, which was almost midway between South Bay and Carlotta. Extra 4 had been delayed by an accident farther north, and had not yet arrived at Cousins's switch. Conductor Clark of train 5, having taken on the E. R. V. Lumber Company's train as directed by his special order, proceeded north with his train without waiting for extra 4, with the result that in the neighborhood of Fortuna, the next station north of Cousins's switch, his train came into collision with extra 4, which was proceeding south in strict accord

with its orders. Concededly the failure of Clark to comply with the requirements of the meet order was the sole cause of the deplorable accident. Under the law of this state as it was at the time of the collision, deceased and Clark were fellow-servants, and no recovery could be had against defendant by the heirs of deceased for damages resulting solely from the negligence of Clark.

The claim of plaintiffs, sustained by the jury that tried the case, was that Clark was incompetent to act as conductor of train 5, that defendant had failed to use ordinary care in selecting him to serve in that capacity, and that his incompetency was the cause of the accident, thus bringing the case within the rule of law that renders the employer liable to an employee for damages resulting from his failure to use ordinary care in the selection of other employees and to select only those who are competent to properly perform the duties of the position for which they are selected—the rule declared by section 1970 of the Civil Code, as it was at the time of the accident, as follows: "An employer is not bound to indemnify his employee for loss suffered by the latter . . . in consequence of the negligence of another person employed by the same employer in the same general business, unless the negligence causing the injury was committed in the performance of a duty the employer owes by law to the employee, or unless the employer has neglected to use ordinary care in the selection of the culpable employee."

In accord with this claim, the jury specifically found in response to questions submitted to them—1. That Peter Clark was incompetent to act as conductor of train No. 5 at the time of the collision; 2. That the collision was caused by such incompetency of Peter Clark to act as conductor; 3. That the defendant failed to use ordinary care in the selection of Peter Clark for the position of conductor for such train, and, 4. That the defendant prior to the accident knew that Clark was incompetent for the position of conductor on such train, or could have known it by the exercise of ordinary care on its part. A general verdict in favor of plaintiffs was also rendered.

It must be borne in mind that the question before us in considering the attack on the verdict of the jury is not how we would find the facts to be, but whether there was enough in the evidence from which the jury might find the existence

of facts which would justify the verdict they rendered. It, of course, devolved on plaintiffs to show that Clark was in fact incompetent for the position to which he was assigned, that defendant at the time of his selection therefor either knew or by the exercise of ordinary care would have known of such incompetency, and that such incompetency was the cause of the accident. The verdict of the jury constituted findings in the affirmative upon all these propositions. Was there substantial evidence in support thereof? If so, the verdict must stand, however strongly such evidence may be opposed to other evidence given on the trial. In cases of mere conflict of evidence, the conclusions of the trial jury and judge are conclusive on the question as to which side produced the "preponderance of evidence." (See *Fowden* v. *Pacific Coast Steamship Co.*, 149 Cal. 151, 159, [86 Pac. 178].)

As we have said, it is necessarily conceded that the failure of Clark to hold its regular schedule train at Cousins's switch until the arrival of extra 4, in accord with the requirements of the meet order, was the cause of the accident. Was this failure due to his incompetency or unfitness from any cause to act in the position to which he had been assigned, or was it due to his mere negligence in the discharge of duties which he was entirely competent to perform? The incompetency claimed is that he was not possessed of adequate knowledge of the meaning and effect of a "meet order" under such circumstances as confronted him at Cousins's switch on the day of the accident, the kind of incompetency referred to in *Nofsinger* v. *Goldman,* 122 Cal. 609, 617, [55 Pac. 425, 429], where it was said: "An engineer might not be careless; he might exercise extreme care within the limitations of his knowledge, and yet for lack of adequate knowledge might be unfit and incompetent for the position," and in *Evansville etc. R. R. Co.* v. *Guyton,* 115 Ind. 450, [7 Am. St. Rep. 458, 17 N. E. 101], a case similar in many respects to this. Incompetency connotes the converse of reliability in "all that is essential to make up a reasonably safe person, considering the nature of the work and the general safety of those who are required to associate with such person in the general employment." (1 Labat on Master and Servant, sec. 181.) It goes without saying that one who does not know the meaning of the rules or orders used on a railroad relative to the

movement of trains is absolutely incompetent to act as a conductor of a train thereon where he would be called upon to follow such rules and orders in moving his train. We are satisfied that the evidence amply warranted the jury in finding that Clark was without this knowledge, and that his ignorance in this respect was the sole cause of the accident.

Clark had been acting as conductor of this train for less than a month, having commenced on September 10, 1903. His employment on this train was practically his first experience as conductor on a schedule train, there being some testimony that between July 17, 1903, when he came to this road, and September 10, 1903, he had acted for a few days as conductor. During the same time, he had acted for a few weeks as conductor of a gravel train, an inferior unscheduled train, running under special orders. During the same interval of less than two months he had also acted for a very short time as brakeman on a passenger train on this road. For nearly two years prior to July 17, 1903, he had been a brakeman on a passenger train on the railroad running from Eureka to Arcata, a short road which had only one train and one train crew, and where, consequently, there were no rules or orders as to the meeting and passing of trains. Prior to that time, he had worked for some years on the road where the accident occurred in the several capacities of section man, tunnel watchman and fireman, positions in which he had not been required to know or charge his mind as to the effect of orders relative to the meeting of trains. Prior to assuming the work of conductor he had shown himself to be a reliable and competent man in the various positions in which he had been placed, which would rather tend to indicate that within the limits of his knowledge he would not be likely to make a mistake in such a vital matter as the one causing the accident. The evidence was not such as to compel the conclusion that he had ever before been confronted with the situation that confronted him at Cousins's switch on the day of the accident, or that he had ever been informed or had ever learned that a regular schedule train, arriving at a place where it had been directed by special order to meet an inferior train before the arrival of the latter, was bound to await such arrival unless the special order was withdrawn or modified. Upon being made a conductor, he was given a printed schedule or

time table of the various regular trains, on the back of which were printed what was styled "Time Table Rules." A new time table to take effect October 5, 1903, at 12:01 A. M., was issued before the accident, and a copy placed in his hands. On this appears the schedule for his train, "No. 5 Freight." At the bottom of the page, in large type, appeared the following: "North-bound trains are superior to and have the right of track over south-bound trains of same or inferior class." At the time of the accident his train was north-bound, while extra 4 was south-bound, and inferior to his train under the express provisions of a rule printed on the back of the time table. Among the other rules so printed on the back of such time table was rule 8, providing that "inferior trains must keep out of the way of all superior trains," and rule 16, providing "when the expected train is not found at the schedule meeting or passing point, the superior train will proceed on schedule; the inferior train will take siding and wait for the superior train." When Clark arrived at Cousins's switch, he had his special order in mind, as is fully shown by his compliance with that portion thereof requiring him to take on the "E. R. V. Lbr. Co's train," so that his action in proceeding with his train cannot be accounted for on the theory that he had forgotten the existence of any special order. In addition to this, Joseph Still, the fireman on train 5, testified that before directing the engineer to move out from Cousins's switch, Clark told him, the engineer, "our instructions were to meet No. 4, but we are the superior train and we will run on schedule, run on rule 16 and extra 4 will have to take siding and keep out of the way." It appears that this statement of Still was denied by Clark when he was recalled as a witness by defendant, and that Still was a brother of deceased, and also had a damage suit pending against defendant arising out of the same accident, but we must assume that the jury believed the testimony of Still in this regard, and they were the sole judges as to his credibility. It also appeared that Still had given the same testimony in the presence of Clark on two previous trials of another action growing out of this accident, and that no denial thereof had then been made. Clark himself was not called by either party to testify at this trial as to the circumstances of the accident, or to explain why he had disregarded the "meet order."

Of course, it is possible that Clark did know the full meaning and effect of such orders as applied to regular schedule trains, and that his proceeding on the day of the accident in violation of the order he had received was due simply to forgetfulness, and constituted merely an act of negligence on his part. But we have no doubt whatever that the evidence above set forth was sufficient to warrant a jury in concluding that he did not possess the knowledge that such an order superseded all schedules and printed rules in so far as such schedules and printed rules conflicted therewith, and that he believed that it was his duty to proceed from Cousins's switch with his regular schedule train under such printed rules, without waiting for the inferior train he had been directed to meet at that point. If they so concluded, they were necessarily compelled to find him to be incompetent to discharge the duties of the place to which he had been assigned.

. This brings us to the question whether defendant used ordinary care in the selection of Clark as conductor of the freight train, or rather, whether the evidence was such as to sustain the finding of the jury that it did not use ordinary care. Under all the authorities, the term "ordinary care" as used in this connection means that degree of care that a man of ordinary prudence would use in view of the nature of the employment and the consequences of the employment of an incompetent person—a degree of care commensurate with the nature and danger of the business and the grade of service for which the servant is intended, and the hazards to which other servants are to be exposed from the employment of a careless or incompetent person. (Wood on Law of Master and Servant, secs. 417, 418.) In accord with this rule, it is generally declared that where the service in which the servant is employed is such as to endanger the lives and persons of co-employees if the servant is not competent, an employer is bound in the exercise of ordinary care, upon the plainest principles of justice and good faith, to make a reasonable investigation into his character, skill, qualifications, and habits of life. (See 1 Labat on Master and Servant, sec. 194; Bailey's Personal Injuries, sec. 1407; *Western Stone Co.* v. *Whalen,* 151 Ill. 472, [42 Am. St. Rep. 244, 38 N. E. 241]; *Mann* v. *Delaware etc. Co.,* 91 N. Y. 495.) The question whether he has made such investigation as is reasonable under all the circumstances

is peculiarly one for the jury. As has been said before, even
where there is no conflict in the evidence on the question of
negligence, if the conceded facts are such that reasonable
minds might differ as to the conclusion to be drawn, the ques-
tion is one of fact for the jury. (*Sellers* v. *Market St. Ry.
Co.*, 139 Cal. 271, [72 Pac. 1006].) The presumption is that
the employer has done his duty in this regard (*Beaseley* v.
*San Jose Fruit etc. Co.*, 92 Cal. 388, [28 Pac. 485]), and as a
general rule, the employer's knowledge of incompetency or
the fact that he would have obtained such knowledge had he
made reasonable inquiry must be shown by evidence inde-
pendent of that showing the incompetency, and cannot be
inferred therefrom. Mr. Labat, in his Master and Servant,
says that the latter rule is subject to certain qualifications,
one of which is that the testimony by which the incompetency
is established may be such as to warrant a conclusion that
the employer either had notice of the incompetency, or omit-
ted to make such inquiries as common prudence would have
dictated (sec. 196), and that it seems impossible to deny that
the delinquency which caused the injury may be of such a
flagrant character that a jury might fairly infer that the
master could not have failed to discover the servant's unfitness
if proper inquiries had been instituted when he was hired.
(Sec. 199. See, also, Bailey on Personal Injuries, sec. 1419.)
In *Murphy* v. *St. Louis etc. R. Co.*, 71 Mo. 202, this is declared
to be the law, and the statement is made that the inference
is one of fact for the jury. In *Lee* v. *Michigan C. R. Co.*, 87
Mich. 574, [49 N. W. 909], the evidence showing incompetency
was of such a nature that the court said that proof that he
was so incompetent when employed need not be supplemented
by proof of the employer's knowledge thereof, the presump-
tion that the employer had done his duty being overcome by
the proof of incompetency. It further said that where one
competent at the time of employment becomes incompetent
or indulges in a habit which renders him incompetent during
its indulgence, notice of the incompetency must be brought
home, but that where the incompetency existed at the time of
the employment, proof of notice is not necessary. This was
said in reference to one who had been employed only a few
weeks. In *Pleasants* v. *Raleigh etc. R. Co.*, 121 N. C. 492,
the court said that there was no evidence that the defendant

knew of the incompetency of Dunn when he was employed, except his action on the occasion of this fearful wreck, and the fact that he had been employed in this capacity only a few weeks, but that these facts raised such a presumption against the defendant as to make this an issue fit to be submitted to the jury under proper instructions. These are examples of decisions that support the statement of Mr. Labat. If it be conceded that any of them states the rule in broader terms than is warranted, we think nevertheless that there can be no doubt under the authorities that the incompetency of an employee at the time of his employment may be of such a character that the evidence showing it will be legally sufficient to rebut the presumption that the employer used the requisite care in his selection, and make the question one for the jury. This is on the theory that the incompetency was of such a nature that a reasonable investigation would have disclosed it, and that, therefore, the employer either knew of it or omitted to make such investigation, the same theory upon which evidence of general reputation of the employee for incompetency is admissible to show want of care on the part of the employer. (See *Gier* v. *Los Angeles etc. Co.*, 108 Cal. 129, [41 Pac. 22]; *Gilman* v. *Eastern R. R. Co.*, 13 Allen, 433, 441, [90 Am. Dec. 210].) When we speak of the time of his employment, we mean the time when he was assigned to the particular employment. An employer is bound to institute affirmative inquiries in order to ascertain the qualifications of an employee whom he transfers to a more responsible position, for which special qualifications are demanded, unless the employee has given proof of his capacity in some similar position. (Labat, sec. 194. See, also, *Mann* v. *Delaware etc. Co.*, 91 N. Y. 495.)

The rule we have just discussed appears to us to be peculiarly applicable to incompetency of the character found by the jury on sufficient evidence to exist in the present case,—viz. want of knowledge by a conductor of a schedule train as to the meaning and effect of telegraphic orders referring to the movement of his train in relation to other trains on the road. The safety of all those associated with him is dependent on his having such knowledge, and the most ordinary care requires reasonable affirmative investigation on the part of the employer to ascertain that the employee has it before

assigning him to the employment. Where such incompetency is shown it is a fair inference that a reasonable investigation would have disclosed it, when it could have been remedied by proper instruction. The uncontested showing by an employer in response to the *prima facie* case thus made may doubtless be such in some cases as to require the conclusion, as a matter of law, that the requisite investigation was made and that the result thereof fully warranted the employer in selecting the culpable employee. But the record here presents no such case. There was evidence showing some inquiry by the train master, and some discussion by him with Clark himself relative to the duties to be performed about the time he was first assigned as a conductor, but the evidence in this behalf relied on by defendant was such that, assuming it to be without conflict, reasonable men might well differ as to whether it showed such investigation as was requisite under the circumstances. The proposed conductor was being taken from the position of brakeman on a road where, by reason of the fact that there was only one engine and one train crew, it was not essential for even a conductor to know anything about the rules and orders for the meeting and passing of trains. His service in that capacity on that road had continued for nearly two years next preceding his employment on the road where the accident occurred. His former employment on the road where the accident occurred had been several years before and in capacities wherein he was not required to charge his mind with rules and orders relative to the meeting and passing of trains. His reputation as a careful and competent man, and the recommendation of Mr. Rose, the former trainmaster, amounted to no more than a showing that he was a competent railroad man within the lines of his knowledge and experience, and that he was the kind of man who might safely be made conductor of an extra train on defendant's road. Mr. Rose's statement to the trainmaster was substantially that he was a valuable man and that he had promised him a conductorship of a gravel train on this road when the same was put on. There was nothing in all this to warrant the conclusion on the part of the trainmaster that either by experience or actual instruction, Clark had acquired the adequate knowledge as to rules and orders relative to the meeting and passing of trains. The testimony as to the conversations between Clark

and the trainmaster at and about the time of his employment is not of such a nature as to require a conclusion that the trainmaster was warranted in assuming that he had such knowledge, and the same must be said of the experience of Clark as conductor of the extra gravel train immediately prior to his employment as conductor of a regular freight train. A very clear knowledge on the part of the conductor of a regular schedule train as to the unprinted rule making a special "meet order" superior to all the printed "time-table rules" was especially essential, in view of the printed rules which expressly declared extra trains "inferior to all regular trains," required "inferior trains" to keep out of the way of all "superior trains," and provided that when the expected train is not found at the schedule meeting or passing point, the superior train will proceed on schedule time, and the inferior train will take siding and wait for the superior train.

The case of *Gier* v. *Los Angeles etc. Co.*, 108 Cal. 129, [41 Pac. 22], is much relied on by learned counsel for defendant, but we see nothing therein that is in conflict with what we have said. As the court there said, the act producing injury in that case "was not one evincing incompetency, employing the word strictly to denote a lack of skill or ability to use appliances or perform a duty in a workmanlike way, but was a single and signal exhibition of carelessness or recklessness," being the voluntary starting and sending ahead his electric car by a motorman under such circumstances that the car must strike the conductor who was standing at a switch. The motorman had been originally employed by the defendant as a driver of a horse car, and was subsequently trained as a motorman. At the time of his original employment, inquiry was made by the defendant of his former employers for whom he had acted in the capacity of driver of a horse car, and they had declared him "to be the best and most careful of men."

It was in regard to such a case that the court said that defendant was not at fault in originally employing as a motorman a horse car driver without questioning him personally, inasmuch as it took pains to avail itself of evidence upon the matter "disinterested and superior," that of his former employers. But we do not desire to be understood as intimating that a personal examination of one about to be employed even in such a responsible position as that of conductor of a railroad

train is always essential to the exercise of reasonable care. Such investigation as will warrant the assumption under all the existing circumstances that the employee has adequate knowledge and qualifications is essential. Such an assumption may be warranted by the knowledge of the employer of the experience and reputation of the employee as to work calling for the knowledge and qualifications adequate to the discharge of the duties of the place, or by the recommendation of other persons on whom he is justified in relying. Each case must be determined on its own facts, and generally, as here, the question whether due care was exercised by the employer in this regard is one exclusively for the jury and trial judge.

The verdict was not in conflict with any of the instructions.

The only other points made for reversal are as to the refusal of the trial court to give certain requested instructions to the jury.

The first of these was one to the effect that in determining the question of incompetency the jury might take into consideration "with other evidence" given on the trial, certain specified evidence. As to this instruction it is sufficient to say that no reason appears why the court should have singled out a portion of the evidence given on the issue of incompetency, and specially directed that it might be considered. Under their general instructions, the jury must have known that this evidence with all other evidence on the subject was to be considered by them in determining the question. Instructions which are drawn solely for the purpose of and which simply have the effect of emphasizing some particular portion of the evidence are not to be commended.

The second, defendant's proposed instruction 9, was properly refused. While taken from the opinion in *Gier* v. *Los Angeles etc.*, 108 Cal. 129, [41 Pac. 22], it was misleading as applied to the facts in this case, and assumed facts as to which there was a conflict in the evidence, if indeed, one of such assumed facts was not wholly at variance therewith.

If the third, defendant's proposed instruction 12, had been limited to the proposition suggested by learned counsel, that if defendant had made *reasonable* inquiry as to the fitness and competency of Clark at the time of his employment, with the result that Clark appeared to be competent, it had fulfilled its duty in the matter of selection, notwithstanding it was

afterwards disclosed that Clark was in fact incompetent, it would doubtless have stated the law correctly. Such was the effect of other instructions given as we read them. But by this proposed instruction it was attempted to have the court state what specific acts, inquiries, and information would constitute a reasonable investigation warranting the assumption of competency and requiring a conclusion that defendant had used proper care. We think this proposed statement would have been very misleading as applied to the evidence given on the trial, and that the court properly refused to give it.

The instructions given by the learned judge of the trial court were very complete and fair, and clearly and correctly stated the law applicable to the case.

The judgment is affirmed.

Shaw, J., Sloss, J., Lorigan, J., Henshaw, J., and Beatty, C. J., concurred.

Rehearing denied.