[Civ. No. 12859. First Dist., Div. Two. Dec. 3, 1946.]

B. F. RAINE, Appellant, v. RUDOLPH SPRECKELS et al., Respondents.

Keyes & Erskine, Louis Ferrari and G. D. Schilling for Appellant.

Cushing & Cushing and Brobeck, Phleger & Harrison for Respondents.

GOODELL, J.—This appeal was taken from a judgment in favor of the defendants in a creditor's suit.

The amended complaint alleges that in June, 1936, plaintiff recovered a judgment against the defendant Rudolph Spreckels and others for $923,031.91, on which an execution was returned wholly unsatisfied. It alleges on information and belief that the respondent Rudolph Spreckels transferred to his wife, the respondent Eleanor J. Spreckels, certain securities (3,267 shares of stock in 15 corporations are described in the complaint) or, alternatively, that he transferred to her the money with which she purchased them. Their value is alleged to exceed $250,000. It alleges that the transfer was without any valuable consideration and was made after respondent Spreckels had contracted the debt to the Bank of America (plaintiff's assignor) on which the money judgment was recovered and while he was insolvent. It also alleges that the transfer was made with the intent to hinder, delay and defraud his creditors and particularly the plaintiff. The

prayer is that the transfer be declared fraudulent and void as against the plaintiff; that respondent Eleanor Spreckels account for the property transferred, and that it be applied in partial satisfaction of plaintiff's money judgment.

The court found that the judgment indebtedness was $923,031.91, and that the execution had been returned unsatisfied. But it also found that no transfer had been made of any securities or of any money with which Mrs. Spreckels is alleged to have bought them.

It might be remarked at this point that the appellant did not prove any such transfer of securities or of money wherewith they are alleged to have been purchased, and on this appeal no such claim is made. The case was tried and is now presented on an altogether different theory—one which departs from the plaintiff's pleading—namely, that respondent Spreckels, while insolvent, made an allowance to his wife of $2,500 for each of the first eleven months of 1930; that because of his insolvency such allowance was excessive, and that a substantial part of the $27,500 namely, all over and above a reasonable amount, should be applied on the appellant's money judgment.

The court found that for many years Mrs. Spreckels had received from her husband an allowance of $2,500 each month; that each of the eleven payments in question "was based on a substantial and valuable consideration," and that he at that time was not insolvent.

The appellant contends that the finding against insolvency is not supported by the evidence, and that the duty of support is not a consideration for the allowance by an insolvent husband to his wife of $27,500 in eleven months.

The trial lasted over a week and some 40-odd exhibits were introduced in evidence.

In 1928 Rudolph Spreckels had a net taxable income of $13,400,000 on which he owed a federal income tax of $2,007,484.99. In September, 1929, he borrowed from the Bank of America on his unsecured note $500,000, which was used to pay the third installment of the tax. In January, 1930, he paid $50,000 on the note, and during 1930 several renewal notes for $450,000 were given, with security. Two corporations which he owned owed the bank a large sum of money, and in December, 1930, the entire indebtedness, including the unpaid $450,000, was consolidated into one note

secured by real and personal property. Respondent Spreckels guaranteed the note, and the action which eventuated in the judgment for $923,031.91 was brought on that total indebtedness.

In 1927 the affairs of Kolster Radio Corporation, in which respondent Spreckels was the largest stockholder, took him to New York, where he remained until 1935. Mrs. Spreckels meanwhile remained in California, living in the family home in Hillsborough. Each year he made several visits home.

The size of respondent Spreckels' taxable income for the year 1928 indicates his large resources at that time. He always had been a wealthy man, having inherited about $4,-000,000 from his parents, to which fortune he added greatly by his own efforts. He had been the largest stockholder, and president, of the First National Bank of San Francisco and later the owner of two-thirds of the stock, and president, of United Bank & Trust Company in the same city, which two-thirds interest he sold in 1927 for a little under $3,000,000. He testified that in 1920 his net worth was between $8,000,000 and $10,000,000.

Shortly after arriving in New York in 1927 he was drawn into the active management and control of the Federal Sugar Refining Company which was engaged in the refining and sale of sugar, with a refinery (the second largest in the United States) and an alcohol plant at Yonkers, New York. Between 1927 and 1929 he lent to that company $12,200,000 and in May, 1929, he effected its reorganization by incorporating the Spreckels Sugar Company, taking $12,200,000 of stock therein and wiping out the indebtedness in that amount. Spreckels Sugar Company owned 95 per cent of the stock of Federal, and respondent Rudolph Spreckels owned, in June, 1930 practically all the stock of Spreckels Sugar Company, which took over the assets of Federal. Its plant—real estate, buildings, machinery, equipment and supplies—became the principal asset of Spreckels Sugar Company, which continued to operate the Federal plant until it shut down in August 1930.

In January, 1930, the New York banks notified respondent Spreckels that they would no longer finance the new company and as a consequence the buying of raw sugar to operate the refinery as a producing enterprise had to be suspended. Respondent Spreckels was engaged during all of 1930 and well into 1931 in repeated attempts to dispose of the refinery. He fixed its value originally at $11,000,000. Negotiations com-

mencing early in 1930 were carried on for some months with United Molasses Company. Thereafter negotiations were carried on, lasting from July, 1930, to the spring of 1931, with General Foods Corporation which offered $7,000,000 for the physical properties. These were followed by negotiations with the Suchard interests which were on the basis of $7,000,-000. The New York Central Railroad Company was a prospect for it was then considering a change in its right of way which would have taken in the refinery. Each of these negotiations, in turn, fell through. There was also an unsuccessful plan to combine the output of the Yonkers plant with that of several other refineries. This plan was not abandoned until 1932. Throughout 1930 respondent Spreckels kept the Bank of America in San Francisco informed of his activities by correspondence, which indicated that he was quite confident of a successful outcome. In his letter of July 31, 1930, he stated that the sale of the refinery, upon which he was then working, would enable him not only to liquidate all his outstanding obligations but would place him in a very strong cash position. At the trial he testified to the same effect, saying ''If I could have financed the Sugar Company my other problems would have been solved.'' On October 9, 1930, he wrote the bank that three prospective buyers were then seeking to acquire the refinery and that he was very confident that a satisfactory deal would be consummated shortly.

In 1932 after these efforts had failed, respondent Spreckels by his own action put the Spreckels Sugar Company into receivership. In 1935 the physical properties which he had originally held at $11,000,000, and for which General Foods had offered $7,000,000, were sold for $250,000 or less.

In January, 1930, the Kolster Radio Corporation went into receivership and was liquidated in February, 1931. Respondent Spreckels lost $2,700,000 on his Kolster investment.

In June, 1931, one of the Bank of America's correspondents in New York wrote that a bondholders' committee and another creditors' committee had been appointed in the Spreckels Sugar Company's affairs, and that three proposed deals had fallen through at the last minute.

In 1935 respondent Spreckels signed a confession of judgment in favor of his New York bank creditors in an amount not shown in the record.

Appellant's counsel read to respondent Spreckels from testimony he gave in the receivership proceedings in New York with respect to the situation in January, 1930, when he had been notified by the New York banks that they could no longer finance the Sugar Company. His answer was "It made a hopeless situation as far as the company was concerned, and as far as I was concerned." From this answer the appellant argues that the respondent's insolvency in January, 1930, was admitted by himself. However, the respondent explained this by saying that while it rendered the Sugar Company's position hopeless, as far as financing it as an operating refinery was concerned, it did not render him personally hopeless, for he repeatedly testified that his net worth in January, 1930, was over $16,000,000 and that he had no obligations in default. A balance sheet prepared by Haskins & Sells, as of June, 1930, shows that Rudolph Spreckels' net worth, according to his books (admittedly kept on a cost basis) was $16,481,000. He testified further that the claimed worthlessness of the Sugar Company in January, 1930, could not have been shown by any one, and that in January, 1930, the book value of the Sugar Company's assets was in excess of $12,000,000. It also appears that in January, 1930, neither Rudolph Spreckels nor any of his companies was in default in the payment of interest. The record shows that he was never sued prior to 1934, was never in bankruptcy, and no petition in bankruptcy was ever filed against him.

The following facts, wholly uncontradicted, bear more directly upon the subject of support:

The respondents were married in 1895. Mrs. Spreckels had some means of her own and an inheritance later added to her separate estate. Shortly after the marriage respondent Spreckels made a gift to his wife of the family home on Pacific Avenue in San Francisco which she sold in 1924 for $90,000 or $95,000. In 1911 he made her a gift of $10,000 and in 1928 another of $50,000; on the eve of one of her European trips he gave her a letter of credit for $20,000.

In 1899 respondent Spreckels commenced giving his wife a monthly allowance for the running of their home, which practice continued uninterruptedly for 31 years. The first allowance was $1,000 a month. In 1901 this was increased to $1,200 a month; in 1903 to $1,500; in 1912 to $2,000, and in 1920 to $2,500 a month, at which figure it remained constant until and including November, 1930, when it was discon-

tinued (according to respondent Spreckels' testimony) not because he did not have assets but because of his "cash situation." On the first of each month the Spreckels office issued a check to Mrs. Spreckels for $2,500 and deposited it in her checking account. This went on for over ten years with but trifling deviations. Her allowance was used to pay the servants and the ordinary running expenses of the home, such as supplies, food and clothing. Respondent Spreckels testified that the purpose of the allowance was so that his wife could maintain the home and herself and live in the way the wife of a rich man should live. "In other words, she had her charities, and her entertainment, and all of that she paid for." She testified that out of these allowances she managed to save something each month. Her husband out of other funds paid the chauffeurs, the automobile expenses, the wages of the watchman and gardener—all the "outside expenses" —also all taxes and all insurance premiums, including workmens' compensation.

After respondent Spreckels went to New York in 1927 he rented an apartment in the Ritz-Carleton Hotel and lived there for four or five years. He spent approximately $38,000 for his own furnishings in the apartment. He testified that his bill at the Ritz-Carleton averaged over $2,500 a month for a good many years, and that he entertained there "quite a bit."

During the eleven months in question the respondent Spreckels continued to be under heavy expenses. During the year 1930 his horse racing stable alone cost him $41,684.73 for upkeep, salaries and other expenses; in 1931, $38,091 and in 1932, $13,563.70. In 1932 and 1933 he disposed of his horses. During September, October and November, 1930, his hotel bills in New York were $2,194.10, $2,330.33 and $2,111.59 respectively. He contributed $500 a month to a California water power organization which he had fostered, and the same year donated $3,000 to the Community Chest.

He did not cut down his own living expenses until 1935. In other words, during the five years from January, 1930, when the New York banks withdrew the further financing of his enterprises, through that year and 1931 when he was negotiating with three or four large groups for the sale of the refinery, until the time when he finally had to put the Sugar Company in receivership, he spent just about as much on his

own living expenses as he had spent during the earlier years (1928 for example) before the depression.

Respondent Spreckels testified that although the New York banks declined in January, 1930, to further finance the Sugar Company's operations he saw no need of reducing his living expenses, and that he did not believe he was in such financial condition as to require the reduction of his or his wife's living expenses. He testified further that when the eleven payments were made in 1930 he considered he could liquidate any obligation he might have.

In 1930 the respondent's children were of mature years and no longer lived with them. Mrs. Spreckels testified that in 1930 she was living extravagantly, but would not have done so had she known that her husband was somewhat financially embarrassed. She testified, further, that she always lived as people did who had a good deal of money, and after she purchased the Hillsborough home from her husband she continued to live in the same style as she had previously, and to maintain the same help around the place. When her allowance was stopped she believed it to be only temporary. She testified that her husband never discussed his business affairs with her; he testified to the same effect, and, further, that he never inquired into his wife's business affairs.

The respondent Spreckels had acquired the Hillsborough place in 1922. It was 20.65 acres in area. It was carried on the books at $182,508.29 for the land, improvements and furnishings. On June 17, 1930, Rudolph Spreckels, in whose name it stood, conveyed it by deed to Eleanor J. Spreckels for a cash consideration of $100,000. This transfer was attacked by this appellant. The trial court in that case held that there was a valuable consideration for the transfer. On appeal the judgment for the defendants was affirmed by this court (*Raine* v. *Spreckels,* 54 Cal.App.2d 169 [128 P.2d 709]).

The respondent Spreckels also owned a summer home at Sobre Vista, in Sonoma County, consisting of about 1,800 acres which he acquired shortly after the respondents were married. It had a swimming pool, a tennis court and a half-mile race track on it. The respondent Spreckels' race horses were stabled there. The place cost him over $300,000 and was carried on his books at $252,176.28. In 1934 respondent Spreckels deeded this property to his sister-in-law in satisfaction of a debt to her of $100,000 which money he had borrowed in 1930.

The foregoing statement presents a fair résumé of the financial situation of the respondent Spreckels during the eleven months in question and thereafter. From such résumé his station in life (see *Shebley* v. *Peters,* 53 Cal.App. 288 [200 P. 364]) may be deduced. It presents, also, a picture of the scale of living of both respondents during that time.

The appellant concedes that a wife is entitled to a reasonable allowance for her support, and that such allowance should be determined according to her husband's station in life. But the appellant argues that she is not entitled to anything beyond such reasonable allowance, and that any surplus over and above that "is a gift to her without the vestige of a consideration." The appellant concedes, in other words, that of the monthly allowance of $2,500 there was a valid and sufficient consideration up to a certain point, but he argues that beyond that there was none; that in 1930 respondent Spreckels' station in life had already changed.

At oral argument the question was put to appellant's counsel as to how the amount of the allowance should be determined and they promptly answered, by the court. Granting that this is so, the answer is that the trial court has determined it. It has spoken after hearing voluminous evidence respecting not only the husband's station in life but the wife's as well.

Whether or not there was a sufficient consideration in this case was an issue squarely joined by the pleadings. On that issue the court found,—"that for many years prior to the month of January 1930, defendant Rudolph Spreckels had paid monthly to defendant Eleanor J. Spreckels, his wife, a monthly allowance of $2500. for her care, maintenance and support; that Rudolph Spreckels continued during the first eleven months of 1930 to make such monthly payments of $2500. . . . ; that each of said monthly payments so made during the calendar year 1930 were in discharge of Mr. Spreckels' legal duty to care for, maintain and support his wife, . . . and each of said payments was accepted by her in discharge of such obligation; that each of said monthly payments . . . during the first eleven months of 1930, was based on a substantial and valuable consideration, and was not voluntary, and each was made by said defendant Rudolph Spreckels, and received by said defendant Eleanor J. Spreckels, without any intent on the part of either to hinder, delay or defraud the then existing or future creditors of defendant,

Rudolph Spreckels, including plaintiff and plaintiff's assignor."

When the court found that the eleven monthly payments "were in discharge of Mr. Spreckels' legal duty to care for, maintain and support his wife" and were "based on a substantial and valuable consideration" it impliedly found, contrary to appellant's contention, that the *amount* of such payments, namely, $2,500 a month, was commensurate with the husband's station in life and was a fit and proper allowance, and not excessive. If this judgment should be reversed, a new trial could accomplish no more than has been already accomplished. The trial court, in such event, would have to again make its decision on the facts which have been already passed upon. This court on appeal cannot say whether $2,500 was a proper allowance, or whether it should have been (as appellant contends) but $200 a month, or some amount in between those extremes. That was and is purely a question of fact related to the issue of consideration.

Whether there is a sufficient consideration to support a contract is always a question of fact. (*Estate of Thomson*, 165 Cal. 290, 296 [131 P. 1045].)

The trial court presumably directed its inquiry to the circumstances as they existed in 1930, for "The sufficiency of a purported consideration for a contract must be determined from the facts of the transaction as they existed when the contract was made rather than by subsequent developments." (*Long Beach Drug Co.* v. *United Drug Co.*, 13 Cal. 2d 158, 165 [88 P.2d 698, 89 P.2d 386], citing cases and 6 Cal.Jur. 167.)

In passing upon this issue of fact the trial court had before it the voluminous testimony, already sketched, touching the resources, assets and general financial condition of respondent Spreckels during 1930, the testimony showing the history of the allowances, and the scale of living of both husband and wife during 1930. There was abundant testimony, therefore, as to the husband's station in life at the time in question.

Whether the respondent Spreckels' station in life had, or had not, changed during 1930 was a question of fact. The evidence already summarized as to his expenditures in New York for his own living during those eleven months and for several years beyond 1930 would seem to have some bearing on the size of the allowance to his wife. The evidence as

to the heavy expenses respondent Spreckels was still carrying in 1930 (race horses $41,684.73, for example) was undoubtedly introduced for the purpose of showing that his station in life had *not* changed at that time. The evidence shows without contradiction that the negotiations with General Foods which was on a $7,000,000 basis lasted from July of 1930 into the spring of 1931. Other negotiations with Suchard and others followed thereafter. The receivership was not until 1932. Then there was a plan of reorganization whereby a very large sum was to have been borrowed from the Refinance Corporation. All this evidence had a bearing on the respondent Spreckels' station in life, and all of it was addressed, of course, to the trial court. It was upon all this evidence that the court based its findings of fact.

". . . In a case where the question of the sufficiency of the consideration for the contract rests wholly upon the construction of the evidence, which is conflicting, a verdict for the plaintiff will not be disturbed on appeal . . ." (6 Cal.Jur. 168).

In *MacDermot* v. *Hayes,* 175 Cal. 95, 104 [170 P. 616], the court said: "The rule is to well settled to require citation of authority that where the facts established may reasonably authorize opposite inferences and the trial court has adopted one and rejected the other, its decision is binding upon this court upon appeal, the case being in substance the same as that where it decides upon the weight of contradictory evidence." To the same effect are *Parrino* v. *Rallis,* 116 Cal. App. 364, 366 [2 P.2d 515] (a case dealing with sufficiency of consideration) and *Fanning* v. *Green,* 156 Cal. 279 [104 P. 308]. See, also, *Keating* v. *Morrissey,* 6 Cal.App. 163, 168 [91 P. 677] and *McCampbell* v. *Obear,* 27 Cal.App. 97, 101 [148 P. 942], both dealing with sufficiency of consideration.

In *Parker* v. *Riddell,* 41 Cal.App.2d 908, 913 [108 P.2d 88], a fraudulent conveyance case, the court says: "In considering an attack upon the findings, the test is 'not how we would find the facts to be,' but whether there was substantial evidence strong enough to justify the conclusion reached. (*Still* v. *San Francisco etc. Ry.,* 154 Cal. 559 [98 P. 672, 129 Am. St.Rep. 177, 20 L.R.A.N.S. 322] ; *Foster* v. *Foster,* 8 Cal.2d 719 [68 P.2d 719].) . . ."

Other cases, involving insolvency or fraudulent conveyances or both, and holding the same way, are *First National Bank* v.

*Ranger,* 49 Cal.App. 447 [193 P. 788] ; *Security etc. Bank* v. *Bruder,* 44 Cal.App.2d 767, 771 [113 P.2d 3], and *Kirkpatrick* v. *Towers,* 60 Cal.App.2d 251, 254 [140 P.2d 681].

The appellant has culled from the evidence six items of expenditures made by Mrs. Spreckels during the eleven months in question, which it is claimed, were not for purposes contemplated by the allowance. These aggregate $11,603.33, and the appellant's position is that such amount should be held to respond to the appellant's money judgment. All these items were before the trial court, along with the numerous other questions to be weighed by the trier of the facts, and what has been said already respecting the findings of the trial court applies to these items as well.

During the trial counsel for appellant stated to the court that they had found no case dealing exactly with the situation. No such case has been cited on this appeal. The appellant relies chiefly on *Trefethen* v. *Lynam,* 90 Me. 376 [38 A. 335, 60 Am.St.Rep. 271, 38 L.R.A. 190]. In that case the husband, a sea captain, away from home most of the time, habitually sent his wife remittances of his earnings. These she intermingled with other money of hers used in the carrying on of a summer resort which she ran. He, on one occasion, contracted for the building of a structure on the resort premises, which stood in her name, and his creditor found nothing standing in *his* name upon which to levy. The court held that in such circumstances the property standing in the wife's name—the husband's earnings in large measure having been swallowed up in her venture—was answerable to the husband's creditors. Other cases cited by the appellant are no closer to the point. No case has been cited dealing with a stated monthly allowance.

In order for a creditor to prevail under section 3442, Civil Code, as it read in 1930 there must be a concurrence of want of consideration *and* insolvency. (12 Cal.Jur. 1019, § 60; 1065, § 101; *Security Trust Co.* v. *Silverman,* 210 Cal. 578 [292 P. 636] ; *Cain* v. *Richmond,* 126 Cal.App. 254, 258 [14 P.2d 546] ; *Enos* v. *Picacho Gold Mining Co.,* 56 Cal. App.2d 765, 776 [133 P.2d 664].) The trial court has found as a fact, from evidence susceptible of opposite inferences, that there was sufficient consideration in this case. It is not necessary, therefore, for this court to pass upon appellant's other point—that the evidence is insufficient to support the

finding that the respondent Spreckels was not insolvent in 1930.

The judgment is affirmed.

Nourse, P. J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 30, 1947.