Filed 8/26/25  TransAmerican Power Poles v. Sacramento Municipal Utility Dist. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| TRANSAMERICAN POWER POLES, INC., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> SACRAMENTO MUNICIPAL UTILITY DISTRICT, <br><br> Defendant and Appellant. | C100384 <br><br> (Super. Ct. No. 34-2021-00293259-CU-BC-GDS) |

TransAmerican Power Poles, Inc., doing business as TransAmerican Power Products, Inc. (TransAmerican), had a contract with Sacramento Municipal Utility District (SMUD) for the supply of steel poles and related products.  However, in e-mails to SMUD, an unknown third party posed as TransAmerican employees and tricked SMUD into transferring $248,885 to a bank account that did not belong to TransAmerican.  A document seeking to change the bank and account number for payments by electronic funds transfer appeared to have been sent from TransAmerican's controller and administrative director, but that officer did not send the document.  SMUD was unable to recover the wired funds once the fraud was discovered, and it refused to pay TransAmerican for the amount that had been paid.

1

TransAmerican sued SMUD for breach of contract. Following a bench trial, the trial court entered judgment in favor of TransAmerican.

SMUD now contends (1) it made payment to TransAmerican's ostensible agent, (2) performance was excused under the contract because it was impossible or impracticable to perform, (3) the trial court should have applied California Uniform Commercial Code principles to reject the breach of contract claim, (4) requiring SMUD to pay TransAmerican after it already paid the imposter would be a gift of public funds, (5) the award of prejudgment interest was improper because SMUD showed, under the Civil Code, that it was prevented from paying TransAmerican, and (6) the trial court should have granted SMUD leave to file a cross-complaint.

We conclude SMUD's contentions are forfeited or lack merit. Accordingly, we will affirm the judgment.

BACKGROUND

SMUD entered into a four-year blanket agreement in 2018 with TransAmerican, a Texas company, for the supply of custom-designed steel poles, arms, anchor bolt assemblies, and fabricated steel structures (the Framework Order). More than a year and a half later, SMUD issued a purchase order revising the unit prices for steel poles. The Framework Order and purchase order (collectively the contract) do not specify the method of payment.

TransAmerican delivered steel poles to SMUD under the contract and submitted invoice No. 31064 for $89,479 and invoice No. 31382 for $159,406 for the poles supplied. In April and May 2020, Rodney James, a procurement specialist in SMUD's supply chain unit, exchanged e-mails with TransAmerican's project manager Martin Avila about invoices. The communications were made from and to Avila at martin.avila@tappinc.com. Tappinc.com was the domain name for TransAmerican. Adjustments were made to the amount SMUD owed because of certain disagreements.

2

On May 15, 2020, James received an e-mail from martin.avila@tappincs.com, attaching a revised invoice. James did not notice the e-mail came from tappincs.com. Tappincs.com was not TransAmerican's domain name.

Four days later, an e-mail from martin.avila@tappincs.com asked James to update TransAmerican's bank account for electronic funds transfer payments. The e-mail stated, "We have been informed that our previous bank account is currently under audit/review for the fiscal year as advised by our CPA firm and has been revised. [¶] In the interim, we authorize that all outstanding invoices due for payment should be remitted to our Regions bank account." The e-mail appeared to have also been sent to Hector de Uriarte, TransAmerican's controller and administrative director, at huriarte@tappinc.com. The address huriarte@tappinc.com was de Uriarte's correct work e-mail address, but TransAmerican's bank account was not under audit, TransAmerican did not bank with Regions Bank, and it was not Avila's role to communicate with customers about TransAmerican's bank account information. De Uriarte did not receive the May, 19, 2020 e-mail from martin.avila@tappincs.com.

James received the e-mail request to change TransAmerican's bank account information. He thought the e-mail was "sketchy" and it raised a red flag for him. James forwarded the revised invoice and e-mails from martin.avila@tappincs.com to SMUD senior accountant Nathalie Ortiz and asked Ortiz to review the revised invoice, stating "this is your expertise." Ortiz worked in SMUD's accounts payable unit. James testified he was not an accounting specialist, the request from martin.avila@tappincs.com did not appear normal to him, and he thought Ortiz would do her due diligence.

Ortiz asked James to have TransAmerican complete a form to identify the bank and account number for payments by electronic funds transfer. James told Ortiz, "Seems shady to me" and asked, "Have you seen this before?" Ortiz answered, "No I haven't[,] that is really weird. I don't know why a review by their CPA would cause them to have a hold on their account. It's a little weird. We can also, instead of changing the ACH

3

information, just send them a check." Ortiz told James she would call TransAmerican if it insisted on changing its bank information. Ortiz testified she intended to make sure TransAmerican actually wanted to change its bank information and she thought it would be prudent to call TransAmerican to verify the change request.

James sent an e-mail to martin.avila@tappincs.com and huriarte@tappinc.com asking Avila to complete the form. De Uriarte did not receive the e-mail and testified he would have immediately contacted SMUD if he had.

A completed form was sent from huriarte@tappinc.com. De Uriarte testified he did not complete the form nor send it to James. James forwarded the completed form to Ortiz. The submitted form designated Harris Bank in Naperville, Illinois as the bank for electronic funds transfer payments to TransAmerican. De Uriarte was identified as the contact person. The form included a signature for "Administrative Director" and provided an incomplete contact phone number.

TransAmerican did not have a bank account with Harris Bank. The signature on the form was not de Uriarte's. The partial phone number on the form – "281-444-627" – was incorrect. The correct phone number for TransAmerican was (281) 444-8277. The date on the form – "20-5-2020" – did not follow the American convention for listing dates.

Ortiz called TransAmerican at (281) 444-8277 on May 20, 2020. Her phone log shows a call at 4:54 pm lasting 37 seconds and a call one minute later lasting 13 seconds. She did not leave a voicemail message, and she did not call TransAmerican again to verify the change request before making a $248,885 payment on May 22, 2020, to the bank account number designated on the form she received from James.

De Uriarte informed SMUD on May 28, 2020, that TransAmerican had not asked to change its bank information and a fraud had been committed. SMUD asked Bank of America to reverse the electronic funds transfer payment, but it was unable to get the

4

money back. SMUD did not make a subsequent payment to TransAmerican for invoice Nos. 31064 and 31382.

TransAmerican filed a complaint for breach of contract against SMUD. De Uriarte, Ortiz, and James testified at trial. Ortiz testified that accounts payable had to verify change request forms sent directly to accounts payable but did not need to verify forms that were forwarded to accounts payable by SMUD's supply chain personnel. Ortiz said she accepted the form submitted to her because it came from the supply chain unit.

The trial court admitted into evidence the declaration of computer forensic expert Steven Konecny and excerpts from Konecny's deposition. Konecny concluded, based on forensic analysis, that the e-mails from martin.avila@tappincs.com were actually sent from a third party e-mail that had some connection to Florida. Konecny averred, "No major business decisions or changes should ever be made without verifying the authenticity of an [e-mail] message. Also, . . . a common control would have been verification of the change of accounts through an alternate means such as a telephone call or video conference with an authorized representative of the company." He said it was a common business practice to have two people sign off before changing payee account information for financial transactions involving the sum of money involved in this case and sending money based on one e-mail without getting any verification was below the standard of care.

The trial court concluded that TransAmerican had proved its breach of contract cause of action and SMUD did not meet its burden of proof as to its affirmative defenses. In particular, the trial court found that SMUD did not exercise ordinary care in making the May 22, 2020 payment because the standard of ordinary care in the industry required verification of the change request by telephone or video conference and James and Ortiz were concerned about the request to change TransAmerican's bank information but no

5

one from SMUD took meaningful steps to allay those concerns.  The trial court awarded TransAmerican $248,885 in damages plus prejudgment interest.

DISCUSSION

I

SMUD contends the judgment must be reversed because SMUD paid TransAmerican pursuant to instructions from TransAmerican's ostensible agent.

" ' "An agent is one who represents another, called the principal, in dealings with third persons." [Citation.]  In California, an agency is "either actual or ostensible." ' [Citation.]  Actual agency arises when the principal's conduct causes the agent reasonably to believe that the principal consents to the agent's act on behalf of the principal. [Citations.]" (*Rogers v. Roseville SH, LLC* (2022) 75 Cal.App.5th 1065, 1074.) Ostensible agency arises when the principal, intentionally or by want of ordinary care, causes a third party to believe a person is the principal's agent even if that person is not. (Civ. Code, § 2300.)

A principal is bound by acts of an ostensible agent as to those who have in good faith and without want of ordinary care incurred a liability or parted with value.  (Civ. Code, § 2334; see also *Still v. San Francisco & N.R. Co.* (1908) 154 Cal. 559, 567 [stating in the context of negligence law that ordinary care means that degree of care and prudence which persons of common understanding usually exercise in the circumstances].)  As the California Supreme Court explained, recovery may be had against a principal for the act of an ostensible agent only when (1) the person dealing with the agent reasonably believed in the agent's authority; (2) the belief was generated by the principal's act or neglect; and (3) in relying on the agent's apparent authority, the person dealing with the agent was not guilty of negligence.  (*Associated Creditors' Agency v. Davis* (1975) 13 Cal.3d 374, 399 (*Associated Creditors' Agency*); accord *People v. Surety Ins. Co.* (1982) 136 Cal.App.3d 556, 562-563.)  Thus, ostensible agency is based on the principal's conduct and the conduct of the person dealing with the agent.

6

Whether ostensible agency exists is a question of fact.  (*Kaplan v. Coldwell Banker Residential Affiliates, Inc.* (1997) 59 Cal.App.4th 741, 748; *House Grain Co. v. Finerman & Sons* (1953) 116 Cal.App.2d 485, 492; Rest.3d Agency, § 2.03, com. d, p. 118.)  We review the trial court's factual findings under the substantial evidence standard.  (*Associated Creditors' Agency, supra,* 13 Cal.3d at pp. 382-383.)  Under that standard, we determine whether, on the entire record, there is any substantial evidence – i.e., evidence that is " 'reasonable in nature, credible, and of solid value' " – supporting the trial court's finding.  (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873, italics omitted; see *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)  We consider the evidence in the light most favorable to the judgment, giving it the benefit of every reasonable inference, and resolving conflicts in the evidence and reasonable inferences in support of the judgment.  (*Cuiellette v. City of Los Angeles* (2011) 194 Cal.App.4th 757, 765 (*Cuiellette*).)  We do not reweigh the evidence.  (*Ibid.*)  The appellant bears the burden of demonstrating that there is no substantial evidence supporting the challenged finding.  (*Foreman & Clark Corp.*, at p. 881.)

James thought the e-mail seeking to change TransAmerican's bank information was suspicious.  He shared his concern with Ortiz.  Even if it had been SMUD's practice not to verify bank information change requests when they were received by supply chain personnel, Ortiz nevertheless found the request to change bank information odd and said it would be prudent to verify it.  Although TransAmerican was based in Texas, she called TransAmerican at 6:54 p.m. and 6:55 p.m. Texas time and did not leave a voicemail message when she did not reach anyone there.  She did not call TransAmerican again or speak with her supervisor before she changed TransAmerican's bank information and wired $248,885 to the new bank account two days later.  Even if de Uriarte had authority to send payment instructions on behalf of TransAmerican, SMUD did not verify that de Uriarte made such a change request.  Ortiz sent the payment without looking closely at

7

the submitted form, and she did so even though the form stated that a properly executed form would not be effective until 15 days after SMUD received it.

Konecny opined it was a common business control to verify account changes by telephone or video conference. He opined that sending money based on an e-mail request, without obtaining verification, was below the standard of care.

On this record, we conclude substantial evidence supports the trial court's findings that SMUD's belief in the authority of the imposter was not reasonable and that SMUD did not exercise ordinary care in processing the form submitted by the imposter. SMUD has not established that TransAmerican was bound by the imposter's acts under an ostensible agency theory.

## II

SMUD next contends its performance was excused under a force majeure clause of the contract because it was impossible or impracticable to perform.

The interpretation of a contract is "a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect." (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) We look at the words of the contract to ascertain the parties' intent at the time of contracting and construe the words of the contract in their ordinary and popular sense, unless used by the parties in a technical sense or unless a special meaning is given to them by usage, in which case the latter must be followed. (Civ. Code, §§ 1636, 1639, 1644.) Where, as here, no extrinsic evidence was admitted to aid in the interpretation of the contract, we construe the contract de novo. (*Ibid.*; *San Mateo Community College Dist. v. Half Moon Bay Limited Partnership* (1998) 65 Cal.App.4th 401, 409.)

A force majeure clause excuses performance when a specified qualifying event causes a party's timely performance under the contract to become impossible or impracticable because of extreme and unreasonable difficulty or expense. (*West Pueblo Partners, LLC v. Stone Brewing Co., LLC* (2023) 90 Cal.App.5th 1179, 1188; see *City of*

*Vernon v. City of Los Angeles* (1955) 45 Cal.2d 710, 720.) SMUD bears the burden of proving its defense of impossibility or impracticability of performance. (*Butler v. Nepple* (1960) 54 Cal.2d 589, 597-598; see *Oosten v. Hay Haulers Dairy Employees & Helpers Union* (1955) 45 Cal.2d 784, 788 (*Oosten*).) " '[M]ere increase in expense does not excuse the performance unless there exists "extreme and unreasonable difficulty, expense, injury, or loss involved." ' " (*West Pueblo Partners, LLC*, at pp. 1188, see *id.* at pp. 1191-1192; *City of Vernon*, at pp. 717-720; *SVAP III Poway Crossings, LLC v. Fitness Internat., LLC* (2023) 87 Cal.App.5th 882, 892-894; see also *Butler*, at pp. 599-600.) We independently determine whether the facts establish the defense. (*Autry v. Republic Production, Inc.* (1947) 30 Cal.2d 144, 156-157.)

The force majeure clause in the purchase order stated: "Neither party hereto shall be considered in default in the performance of its obligations hereunder to the extent that the performance of any such obligations is prevented or delayed by any cause, existing or future, which is beyond reasonable control of the affected party." SMUD does not point to any evidence showing it could not pay TransAmerican $248,885 after erroneously paying $248,885 to the imposter, or that paying TransAmerican $248,885 would impose an unreasonable cost upon SMUD. Additionally, the defense of impossibility contemplates the exercise of prudence, diligence, and care by the party seeking excuse of performance. (*Oosten, supra*, 45 Cal.2d at p. 789; *Pacific Vegetable Oil Corp. v. C. S. T., Ltd.* (1946) 29 Cal.2d 228, 238.) The evidence shows that SMUD did not exercise prudence and care when it changed TransAmerican's bank information. The incorrect payment to the imposter was not beyond the reasonable control of SMUD.

The portions of the record SMUD cites do not support its claim that the contract required SMUD to comply with electronic funds transfer payment change instructions even if the instructions were fraudulent. SMUD's assertion that the trial court improperly required SMUD to prove it exercised ordinary care is forfeited because it is not supported by citation to authority. (*Okasaki v. City of Elk Grove* (2012) 203 Cal.App.4th 1043,

9

1045, fn. 1 (*Okasaki*); *Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 656.) Moreover, the argument that an exercise of ordinary care was not contemplated by the parties is not accompanied by any citation to the record and is also forfeited. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246-1247 (*Nwosu*).)

SMUD fails to establish error with regard to its defense of impossibility or impracticability of performance.

### III

SMUD also argues the trial court should have applied the principles in California Uniform Commercial Code section 3404, subdivision (a) and section 11101 et seq.[1] to reject TransAmerican's breach of contract claim.

We review questions of statutory interpretation de novo. (*Cuiellette, supra*, 194 Cal.App.4th at p. 765.) Section 3404 is part of division 3 of the California Uniform Commercial Code (§ 3101 et seq.), which governs negotiable instruments. (§ 3102, subd. (a).) In general, a negotiable instrument is "an unconditional promise or order to pay a fixed amount of money" that meets all of the requirements of section 3104, subdivision (a).[2] (§ 3104, subd. (a).) Section 3404 provides, in pertinent part, "(a) If an

---

[1] Undesignated statutory references are to the California Uniform Commercial Code.

[2] Section 3104, subdivision (a) provides, "Except as provided in subdivisions (c) and (d), 'negotiable instrument' means an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it is all of the following: [¶] (1) Is payable to bearer or to order at the time it is issued or first comes into possession of a holder. [¶] (2) Is payable on demand or at a definite time. [¶] (3) Does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain (i) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, (iii) a waiver of the benefit of any law intended for the advantage or protection of an obligor, (iv) a term that specifies the law that governs the promise or order, or (v) an undertaking to resolve in a specified forum a dispute concerning the promise or order."

impostor . . . induces the issuer of an instrument to issue the instrument to the impostor . . . by impersonating the payee of the instrument or a person authorized to act for the payee, an indorsement of the instrument by any person in the name of the payee is effective as the indorsement of the payee in favor of a person who, in good faith, pays the instrument or takes it for value or for collection. [¶] . . . ¶] (d) With respect to an instrument to which subdivision (a) . . . applies, if a person paying the instrument . . . fails to exercise ordinary care in paying . . . and that failure contributes to loss resulting from payment of the instrument, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss."

This case involves a funds transfer, not a negotiable instrument, and SMUD does not explain how the terms of the statute, such as endorsement of an instrument, apply in this case. But even if section 3404 applied, it would place responsibility for the loss on SMUD because SMUD was in a position to avoid the fraud and failed to exercise ordinary care. (4 Witkin, Summary of Cal. Law (11th ed. 2017) Negotiable Instruments § 54, p. 423.)

SMUD adds that the judgment is contrary to the principles set forth in division 11 of the California Uniform Commercial Code, citing section 11207, subdivision (b). Division 11 of the California Uniform Commercial Code (§ 11101 et seq.) governs funds transfers. Generally, a funds transfer refers to a series of transactions beginning with an instruction from the sender to the receiving bank to pay a certain amount of money to the beneficiary (payment order) and ending with acceptance by the beneficiary's bank of the payment order. (§§ 11103, subd. (a)(1)-(5), 11104, subds. (a), (c).) The California Supreme Court explained that division 11 of the California Uniform Commercial Code established "detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability" in funds or wire transfers, after balancing the competing interests of banks that provide funds transfer services and organizations that use those

11

services, as well as the public interest.  (*Zengen, Inc. v. Comerica Bank* (2007) 41 Cal.4th 239, 252, see *id.* at pp. 252-253.)  Section 11207, subdivision (b) deals with situations where the name and account number in a sender's payment order to a receiving bank identify different persons.  (§§ 11103, subd. (a)(1), (5), 11207, subd. (b).)[3]  SMUD does not cite the portion of the record showing that the situation described in section 11207, subdivision (b) is present here.  Moreover, section 11207, subdivision (b) addresses the obligations of the beneficiary's bank (here, Harris Bank) and does not address liability as between the sender and the beneficiary.  Section 11207, subdivision (b) does not support SMUD's assertion that the statute allocates the burden of loss to TransAmerican.

SMUD suggests the trial court's statement of decision summarized, but did not apply, five out-of-state cases cited by TransAmerican:  *Arrow Truck Sales, Inc. v. Top Quality Truck & Equip., Inc.* (M.D. Fla., Aug. 18, 2015, No. 8:14-cv-2052-T-30TGW) 2015 WL 4936272, *Jetcrete North America LP v. Austin Truck & Equipment, Ltd.* (D. Nev. 2020) 484 F.Supp.3d 915, *Parmer v. United Bank, Inc.* (W. Va., Dec. 7, 2020, No. 20-0013) 2020 WL 7232025, *Peeples v. Carolina Container, LLC* (N.D. Ga., Sep. 16, 2021, No. 4:19-cv-21-MLB) 2021 WL 4224009 and *Ostrich Internat. Co., Ltd v. Michael A. Edwards Grp. Internat. Inc.* (C.D. Cal., May 18, 2023, No. 2:21-cv-00639-JVS(ASx))

---

[3]  Section 11207, subdivision (b) states:  "If a payment order received by the beneficiary's bank identifies the beneficiary both by name and by an identifying or bank account number and the name and number identify different persons, the following rules apply:  [¶]  (1) Except as otherwise provided in subdivision (c), if the beneficiary's bank does not know that the name and number refer to different persons, it may rely on the number as the proper identification of the beneficiary of the order.  The beneficiary's bank need not determine whether the name and number refer to the same person.  [¶]  (2) If the beneficiary's bank pays the person identified by name or knows that the name and number identify different persons, no person has rights as beneficiary except the person paid by the beneficiary's bank if that person was entitled to receive payment from the originator of the funds transfer.  If no person has rights as beneficiary, acceptance of the order cannot occur."

12

2023 WL 4025870. We do not discuss the cases inasmuch as SMUD does not clearly assert a claim of trial court error based on them.

IV

SMUD further argues that requiring it to pay Transamerican after it had paid the imposter would be a gift of public funds under California Constitution, article XVI, section 6.

We exercise our independent judgment in interpreting constitutional provisions. (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 448-449.) Article XVI, section 6 of the California Constitution prohibits a gift of public funds. But where public funds are used for a public purpose, the transaction is not a gift. (*County of Alameda v. Janssen* (1940) 16 Cal.2d 276, 281; *Oakland v. Garrison* (1924) 194 Cal. 298, 300-303; *Guaranty Trust & Sav. Bank v. Los Angeles* (1921) 186 Cal. 110, 118-119.) "The benefit to the state from an expenditure for a 'public purpose' is in the nature of consideration and the funds expended are therefore not a gift even though private persons are benefited therefrom." (*County of Alameda*, at p. 281.)

TransAmerican delivered, and SMUD accepted, the steel poles and related items described in invoice Nos. 31064 and 31382 pursuant to the parties' contract. SMUD does not contend it did not have to pay for the products or that they were not used for a public purpose. Paying TransAmerican for the products would not be a gift of public funds.

V

In addition, SMUD contends the award of prejudgment interest is improper because SMUD showed, pursuant to Civil Code section 3287, subdivision (a), that it was prevented by law, or by an act of TransAmerican, from paying invoice Nos. 31064 and 31382.

Civil Code section 3287, subdivision (a) provides in pertinent part: "A person who is entitled to recover damages certain, or capable of being made certain by

13

calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day, except when the debtor is prevented by law, or by the act of the creditor from paying the debt. This section is applicable to recovery of damages and interest from any debtor . . . ."

SMUD specifically argues that because TransAmerican allowed a hacker to take over de Uriarte's legitimate e-mail through knowingly inadequate cybersecurity, TransAmerican's conduct prevented SMUD from transferring funds to the correct TransAmerican bank account. In its appellant's opening brief, SMUD recounted various purported facts it had proven in this regard, but because it did not cite to the record in that portion of the argument, and it did not further develop the contention that the award of prejudgment interest was not supported by law, those contentions are forfeited. (*Nwosu, supra*, 122 Cal.App.4th at pp. 1246-1247; *Okasaki, supra*, 203 Cal.App.4th at p. 1045, fn. 1.) To the extent SMUD contended the statement of decision was ambiguous or omitted factual findings, SMUD failed to preserve the contention for review because it did not object to the proposed statement of decision on that ground. (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 59.)

VI

Finally, SMUD contends the trial court should have granted it leave to file a cross-complaint against TransAmerican.

A

The complaint was filed on January 26, 2021. SMUD filed an answer to the complaint two months later, asserting affirmative defenses including that TransAmerican's acts or omissions caused TransAmerican's alleged damages. TransAmerican served SMUD with its first set of discovery requests on April 20, 2021. A trial date of July 31, 2023, was set on March 29, 2022. TransAmerican served its second set of discovery requests on SMUD about a month after the trial date was set. TransAmerican then served notices of deposition for SMUD employees.

14

On May 17, 2023, SMUD filed a motion to continue the trial and related dates. TransAmerican deposed three SMUD employees in late May and early June 2023. SMUD served TransAmerican with its first set of discovery requests on May 30, 2023, 62 days before the trial.

On June 9, 2023, 52 days before trial, SMUD filed an ex parte application for an order shortening the time to hear a motion for leave to file a cross-complaint. The trial court granted the ex parte application in part and set a hearing date of July 6, 2023, for SMUD's motion. SMUD sought to file a cross-complaint against TransAmerican asserting claims for express indemnity, equitable indemnity, and negligence. The proposed cross-complaint alleged that TransAmerican was responsible for the damages claimed in the complaint because its lack of security controls allowed someone to hack its e-mail server and send payment instructions to SMUD from de Uriarte's e-mail account.

On June 23, 2023, the trial court denied SMUD's motion to continue the trial. It denied SMUD's motion for leave to file a cross-complaint on July 6, 2023.

B

SMUD argued in its trial court moving papers that the interests of justice required granting it leave to file its proposed cross-complaint, citing Code of Civil Procedure sections 428.10 and 428.50. Those statutes relate to permissive cross-complaints. (See *K.R.L. Partnership v. Superior Court* (2004) 120 Cal.App.4th 490, 498 [distinguishing permissive from compulsory cross-complaints].) Code of Civil Procedure section 428.10 provides, in pertinent part: "A party against whom a cause of action has been asserted in a complaint . . . may file a cross-complaint setting forth . . . [¶] . . . [a]ny cause of action he has against any of the parties who filed the complaint . . . against him. . . . [¶] [and/or] . . . [a]ny cause of action he has against a person alleged to be liable thereon . . . if the cause of action asserted in his cross-complaint . . . arises out of the same transaction, occurrence, or series of transactions or occurrences as the cause brought against him . . . ." Code of Civil Procedure section 428.50 provides that a permissive cross-

15

complaint must be filed before or at the same time as the answer to the complaint or at any time before the trial date is set.

SMUD did not file its proposed cross-complaint when it filed its answer or before the trial date was set. To the extent it sought to file a permissive cross-complaint, SMUD was required to seek leave of court under Code of Civil Procedure section 428.50, subdivision (c). Under that statute, leave may be granted in the interest of justice at any time during the course of the action. We review a trial court order denying leave to file a permissive cross-complaint for abuse of discretion. (*Crocker Nat. Bank v. Emerald* (1990) 221 Cal.App.3d 852, 864 (*Crocker Nat. Bank*); *Nels E. Nelson, Inc. v. Tarman* (1958) 163 Cal.App.2d 714, 730.) The appellant bears the burden of establishing an abuse of discretion. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566; *City and County of San Francisco v. State of California* (2005) 128 Cal.App.4th 1030, 1037.)

In its moving papers, SMUD asserted: "It has been determined through discovery and investigation that, under the contract between the parties, that the language of the indemnification provision can be asserted between the two parties without suing a third party. Moreover, it has also been made evident that any damages or injury claimed by Plaintiffs in the Complaint was caused or contributed to by the intentional or negligent acts or omissions of the Plaintiff, thereby barring or reducing any potential recovery from Defendant."

The first cause of action of the proposed cross-complaint is based on the indemnity provision in the Framework Order issued by SMUD in 2018. SMUD's motion and the declarations of Matthew Randle in support of the motion did not state what recent discovery and investigation led SMUD to discover its express indemnity cause of action.

Randle's declaration in support of SMUD's reply averred that TransAmerican deposed three SMUD employees in late May and early June 2023, and that counsel for TransAmerican asked the SMUD employees about cybersecurity and issues related to comparative fault. Even if the trial court exercised its discretion to consider evidence

16

first presented in a reply (*Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1537 ["The general rule of motion practice . . . is that new evidence is not permitted with reply papers."]), Randle did not explain how the deposition testimony of SMUD employees "disclosed the grounds for bringing a cross-complaint based on . . . [TransAmerican's] negligent cybersecurity practices," as SMUD alleges on appeal. One of the witnesses testified at trial that he had no knowledge of TransAmerican's cybersecurity measures. At the time of Randle's reply declaration, it did not appear that TransAmerican had responded to the discovery requests from SMUD. The reply and Randle's declaration did not specify why SMUD could not have filed its motion earlier.

On this record, SMUD has not demonstrated an abuse of discretion by the trial court. (*Crocker Nat. Bank, supra*, 221 Cal.App.3d at p. 864 [finding no abuse of discretion in denying leave to file a cross-complaint where the defendant provided no explanation for his delay in seeking permission to file his proposed cross-complaint]; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2024) ¶ 6:562 [stating that a declaration in support of a motion for leave to file a cross-complaint should explain the delay in filing the motion]; see generally Evid. Code, § 500 ["Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting."].) Because there was an insufficient showing that granting SMUD leave to file its proposed cross-complaint was in the interest of justice, and we affirm a trial court's order if it is correct on any theory (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956), we do not discuss the other reasons the trial court stated for its order.

SMUD took a different approach in its trial court reply in support of the motion. SMUD's reply cited Code of Civil Procedure section 426.50, which relates to compulsory cross-complaints. The trial court did not discuss section 426.50 in its order. A trial court need not consider points raised for the first time in a reply unless good cause is shown for

17

the failure to present them earlier.  (*Jack v. Ring LLC* (2023) 91 Cal.App.5th 1186, 1212; *St. Mary v. Superior Court* (2014) 223 Cal.App.4th 762, 783; see Cal. Rules of Court, rule 3.1113(b).)  SMUD's reply did not make such a showing, and on appeal, SMUD does not show how the trial court erred in that regard.  Accordingly, we do not consider SMUD's argument regarding Code of Civil Procedure section 426.50.

## DISPOSITION

The judgment is affirmed.  Respondent shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)


                                            _____/S/_____
                                            MAURO, J.


We concur:


_____/S/_____
EARL, P. J.


_____/S/_____
RENNER, J.